Nicholson, C. J.,
delivered the opinion of the court.
The complainants aré a portion of the legatees of Willis McGregor, deceased, and the defendants are his executor and the executor’s surety.
The bill charges the executor with various acts of negligence and malfeasance in the discharge of his trust, and prays for an account and that the executor and his surety be held responsible.
The executor answers, and explains the several acts alleged to be malfeasance, denies that he has been guilty of either negligence or fraud, and submits to an account.
Several amended bills were filed, repeating with additions the charges of negligence and malfeasance, all of which were answered and explained or denied-.
After much proof, the Chancellor ordered an account, directing the clerk and master, however, not’ to charge the executor with about $500 collected in Southern bank notes, and $3,000 collected on a note of Asa Faulkner in similar funds.
The account was taken, in which the clerk and *678 master allowed the executor about $600 as compensation for his services as executor and $300 for special services rendered to the testator in his life-time.
After exceptions on both sides, the report was confirmed, by which the executor was discharged from liability for the Southern bank notes, and was allowed for compensation as reported.
He was charged $175 for waste of land.
The complainants appeal, and the questions presented here are as to the discharge of the executor from liability from the Southern bank notes and as to the allowance made to him.
The other matters involved in the case below are not put in issue in this court, except that the complainants insist that the Chancellor erred in not allowing them to file a supplemental bill after the final decree in the court below.
The following are the facts necessary to be stated before examining the questions in issue:
Willis McGr.egor was an old man much afflicted and helpless for several years before his death. Some four or five years before his death, he sold off most of his personal property, and converted it into cash and interest bearing notes. After selling his property he was incapable of attending to his out door business, and he employed for this purpose his son-in-law, J. W. Mitchell.
The will of Willis McGregor was made in April, 1859, and was duly proved and recorded.
The fourth clause in the will directs his executor to put out $3,000 at interest, the annual interest to be *679 paid to his wife during her life, and at her death the principal to be divided among his ten children.
The testator appointed his son-in-law- J. W. Mitchell, his executor, who qualified and undertook to to execute the trust. Defendant Faulkner was the surety on his bond as executor.
In the course of his administration, in 1862 or 1863, the executor collected about $800 in Southern bank notes which are still in his hands, and for which he is now sought to be made liable.
In pursuance of the directions of the will, the executor, on the 27th of January, 1862, loaned to Asa Faulkner $3,000 in bank notes, and took his note for the amount payable with interest on the 1st of December, 1862.
About the 27th of March, 1863, Faulkner paid the note with interest in Southern bank notes, to the executor who still has the money in his hands.
For this also the complainants ask to make him responsible.
It is difficult, if not impossible to lay down any general rule as to the amount or character of care and diligence which must characterize the conduct of trustees in the discharge of their duties in order to avoid responsibility.
Good faith is an essential element in the conduct of a trustee, but whenever this is clearly made out,, a court of chancery will examine with indulgence and liberality the surrounding circumstances, to ascertain whether any alleged losses have been the result of culpable negligence.
*680 As well remarked by Lord Hardwicke, “Where trustees act bona fide, and with due diligence, they always have received the protection of courts of equity,” and we doubt whether any better or safer rule than this can be laid down.
In the case before us, the complainants insist that if the executor was not guilty of actual fraud in collecting and holding the Southern bank bills until they became nearly or quite worthless, he was at least guilty of such gross negligence as ought to induce the court to hold him responsible for the loss.
On the other hand, the executor appeals to the court for protection, and insists that when his conduct is viewed in the light of the peculiar circumstances which surrounded him, he acted in good faith, and with due diligence, and that therefore he is entitled to be relieved from loss.
By the terms of the will, the executor undertook to lend out $3,000 for the benefit of the testator’s widow during her life, and for the ultimate benefit of the legatees after her death. It was therefore a directory trust which he assumed, and the first question is, has he shown good faith and due diligence in lending out the money?
It is not denied that he discharged his duty faithfully and prudently when he lent the money to Faulkner.
After the money was repaid him by Faulkner, in March, 1863, was he guilty either of bad faith or of negligence in failing again to lend out the money?
The evidence as to the impossibility of lending *681 money after March, 1863, is conclusive, nor has it been seriously contended that any responsibility rests upon him for not again lending out the money.
But it is insisted with much earnestness and force that he was guilty either of bad faith or gross negligence in receiving payment from Faulkner in depreciated Southern bank notes.
It cannot be disputed that the bank notes received by him were greatly depreciated below gold or United States treasury notes; nor can we doubt that the executor knew of their depreciation. If there was nothing peculiar in the condition of the country, or in the circumstances which surrounded him, that furnishes a reasonable excuse, the fact that he received the money knowing its depreciated value would unquestionably fix upon him the consequences of gross negligence.
The note of Faulkner was due on the 1st of December, 1862, and he had a right to take up his note by paying gold or United States treasury notes.
The proof shows that the executor was unwilling to receive payment of the note. He preferred to hold the note, knowing that Faulkner was perfectly solvent. But Faulkner insisted on paying and taking up the note. He first offered to pay in Confederate treasury notes, and as an inducement to the executor to receive that currency, he offered to pay $3,500 in it for his note $3,000.
The executor refused to take the Confederate money. He did afterward take the Southern bank notes, and the proof is that, whilst they were greatly *682 depreciated, they were the best currency then in circulation in that locality.
To determine whether the executor ought to have refused this currency and insisted upon gold or United States treasury notes, it is necessary to recur to the condition of the country at the time, and to those circumstances that would be likely to control the action and the judgment of an ordinarily prudent man.
The country was in the midst of a revolutionary movement, in which all civil law had been superseded by military authority.
The executor was wholly powerless in coercing the collection of the note in good money. He was compelled either to hold on to the note or to receive payment in the best funds he could get.
He could not hold on to the note. This he sought to do, but Faulkner insisted on paying. In this dilemma how was he to act?
He knew that the revolutionary government was seeking to maintain its struggle by means of a currency which was being forced into circulation by stringent military orders.
He had ventured to refuse this currency in payment of the note. He knew that in so doing he had incurred the risk of military interference.
There is no proof that Faulkner made any threats of coercion; but when he came with the Southern bank notes and offered these for his note, they being the best currency then in circulation, what would probably have been the next step if the executor had refused to receive the Southern bank notes'?
*683 If, as we think it probable, the executor considered that under the circumstances he had either to take Southern bank notes or be forced to take the Confederate notes, we cannot conclude that it was either bad faith or want of due diligence to choose the Southern bank notes as the best he could get.
These considerations apply as well to the $300 received in Southern bank notes, as to the $3,000.
We therefore conclude that the Chancellor’s decree as to the Southern bank notes was correct.
Nor do we think there was any error in allowing to the executor compensation of $300 for four years’ attention to the personal wants and business of the testator in his' life-time, nor in the allowance of $600 for his services as executor.
The motion for leave to file a supplemental bill after the final hearing, was too late, and might well be refused by the Chancellor.
Upon the whole, the decree below is affirmed with costs.